2020 IL App (1st) 182491-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
February 11, 2020

No. 1-18-2491

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

JOSEPH T. RYERSON & SON, INC. (f/k/a Ryerson Inc. and Ryerson Tull, Inc.),

               Plaintiff-Appellant,

   v.

TRAVELERS INDEMNITY COMPANY OF AMERICA, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, and ILLINOIS NATIONAL INSURANCE COMPANY OF ILLINOIS,

               Defendants[1]

(Travelers Property Casualty Company of America, Defendant-Appellee.)

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the
Circuit Court of
Cook County

No. 14 CH 10787

The Honorable
Rodolfo Garcia and
Raymond W. Mitchell,
Judges Presiding.

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

_____

[1] The captions of both the initial complaint and the first amended verified complaint identify the defendants as "Travelers Indemnity Company of America, Travelers Property Casualty Company of America, *et al.*, and Illinois National Insurance Company of Illinois." It does not appear that "*et al.*" was intended to refer to additional parties beyond these three named defendants, as there is not set forth in the body of either of these pleadings the name of any other party against whom relief is sought. See 735 ILCS 5/2-402(c) (West 2018). Also, it appears from the record that Travelers Indemnity Company of America may have been incorrectly named, but in any event the company is now known as Travelers Property Casualty Company of America.

¶ 1    *Held:* (1) Defendant-insurer owed no duty to defend plaintiff-insured in first underlying lawsuit, filed by insured's competitor in the metal service center industry, where competitor's lawsuit did not allege insured disparaged the goods, products, or services of the competitor. (2) Trial court properly dismissed insured's causes of action against insurer for breach of contract and violations of the Illinois Insurance Code and the Consumer Fraud and Deceptive Business Practices Act, arising out of the insurer's defense of insured in second underlying lawsuit, involving a collision between automobile and tractor-trailer.

¶ 2    The plaintiff, Joseph T. Ryerson & Son, Inc., formerly known as Ryerson Inc., and Ryerson Tull, Inc. (Ryerson), filed this lawsuit against its insurance companies, Travelers Indemnity Company of America, Travelers Property Casualty Company of America (Travelers), and Illinois National Insurance Company of Illinois (Illinois National). This case involves two underlying lawsuits in which Ryerson was sued and tendered defense of the suit to Travelers, but the two suits are otherwise unrelated. The first underlying lawsuit was filed in federal court in the Western District of Oklahoma under the caption Champagne Metals v. Ken-Mac Metals, Inc., et al., No. CIV-02-528-C (W.D. Okla.) (Champagne Metals suit). Ryerson alleged in this case that Travelers had a duty to defend it in the Champagne Metals suit, which Travelers breached. It also sought relief under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2014)). Ryerson appeals the trial court's granting of summary judgment in favor of Travelers on the allegations concerning the duty to defend and the dismissal of the corresponding section 155 claim. The second underlying lawsuit was filed in the circuit court of Cook County and was the subject of this court's order in *Hoffman v. Crane*, 2014 IL App (1st) 122793-U (Hoffman suit). Ryerson alleged in this case that Travelers committed breach of contract, violated section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2014)), and violated the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2014)) (Consumer Fraud Act) in the handling of its defense of Ryerson in the Hoffman suit, and it appeals from the trial court's dismissal of those counts. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                 I. BACKGROUND

¶ 4                           A. Champagne Metals Suit

¶ 5        In 2002, Champagne Metals sued Ryerson and six other defendants who were competitors of

Champagne Metals in the metal service center industry. Ryerson and its codefendants had been in

the industry for many decades, but Champagne Metals had been in business for only about six

years when it filed its complaint alleging that Ryerson and the other defendants were engaging in

conspiratorial conduct aimed at keeping it out of the industry. The complaint contained a count for

violation of the Sherman Antitrust Act (15 U.S.C. § 1 *et seq.* (2000)), a count for violation of the

Oklahoma Antitrust Reform Act (Okla. Stat. tit. 79, § 201 *et seq.* (2002)), and a count for the

common law tort of interference with business or contractual relations. It is this common law tort

count that Ryerson alleges in this case triggered Travelers's duty to defend it, as all allegations of

the underlying complaint were incorporated into that count.

¶ 6        The underlying compliant alleged that Ryerson and its codefendants acted "to deny

Champagne Metals a relationship" with the six leading aluminum mills in North America (*i.e.*, the

suppliers of the metal service centers), which Champagne Metals needed to compete in the relevant

market. It alleged that Ryerson and the codefendants engaged in an agreement, understanding, and

concerted action that included "expressing disapproval to certain aluminum mills of any intent,

plan, or consideration to add Champagne Metals as a distributor or to sell aluminum to Champagne

Metals," "threatening certain aluminum mills that Defendants will take business away from the

mills if Champagne Metals is designated as a distributor for the mills or if the mills sell aluminum

to Champagne Metals," and "expressing disapproval to and threatening Pechiney and

Commonwealth for selling aluminum to Champagne Metals." It alleged that this conspiracy caused

four of the aluminum mills to refuse to designate Champagne Metals as a distributor, leaving it

with the ability to buy products from only two of the North American aluminum mills (Pechiney and Commonwealth), neither of which manufactured all of the products that Champagne Metals needed to compete in the industry. It alleged that the conduct by Ryerson and its codefendants caused injury to Champagne Metals by foreclosing it from competing for business in the relevant market and causing it to lose business. It additionally alleged that "customers have determined not to purchase aluminum products from Champagne Metals because of Defendants' conduct and because of the concern that Defendants will put Champagne Metals out of business."

¶ 7        The underlying complaint also contained a paragraph that alleged the following:

"In the alternative, under rule of reason analysis, Defendants' unlawful conduct demonstrates competitive injury in that any arguable prospective benefits resulting from the conduct are clearly outweighed by its anticompetitive effects. For instance, Defendants each have a long history in the metals business and wield substantial power in the relevant market. As a result of said conspiracy, which is generally known in the industry, upon information and belief, other potential service centers have been deterred from entering the relevant market. In fact, upon information and belief, an officer of one of the Defendants stated that Champagne Metals is the biggest mistake in the last 30 years of his career, and that if he had known about Champagne Metals on the day it started, he would have stopped it from entering the market. Thus, as a result of said conspiracy, competition in the relevant market has been injured."

The count for interference with business or contractual relations alleged that Champagne Metals had business and contractual relationships with original equipment manufacturers, other customers, and aluminum mills, and that the defendants maliciously and wrongfully interfered with those relationships, thereby causing injury and damages to Champagne Metals.

¶ 8        According to Travelers, Ryerson did not tender the Champagne Metals suit for defense or indemnification until May 6, 2004. In a letter to Ryerson dated June 28, 2004, Travelers informed Ryerson that it had no obligation to defend or indemnify Ryerson against the allegations of the Champagne Metals suit. It is undisputed that Travelers never filed a declaratory judgment action concerning the propriety of its denial, and it did not defend Ryerson under a reservation of rights.

¶ 9        On June 15, 2004, the district court granted summary judgment in favor of Ryerson and the other defendants on Champagne Metals' claims. See *Champagne Metals v. Ken-Mac Metals, Inc.*, No. CIV-02-528-C, 2004 WL 7318834 (W.D. Okla. Jun. 15, 2004). In its order, the district court addressed the evidence presented by Champagne Metals that Ryerson had participated in a conspiracy, which included evidence of Ryerson's representatives' "complaints to Commonwealth about its relationship with Champagne Metals." *Id.* at *17. In setting forth this evidence, the court referenced a statement attributed by a Commonwealth employee to Ryerson's representative Phil Wylie, that "Mr. Wiley reiterated his belief that [Champagne Metals] did not meet the distributor criteria." *Id.* Concluding that Ryerson's complaints were consistent with its independent business interests, the district court stated, "Wylie may just as likely have been commenting on the likelihood that other service centers were equally concerned about Champagne Metals when he said that Commonwealth risked losing potential customers because of that relationship." *Id.* at *18.

¶ 10       Champagne Metals appealed the district court's granting of summary judgment against the defendants and, on August 7, 2006, the United States Court of Appeals for the Tenth Circuit reversed the district court's decision. See *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073 (10th Cir. 2006). On May 13, 2009, an order was filed in the district court reflecting that the parties had reached a settlement and the case was being dismissed.

¶ 11       Following the conclusion of the Hoffman suit (in which Travelers was defending Ryerson),

Ryerson filed this action in which it sought in Count I a declaratory judgment that Travelers had a duty to defend it against the underlying allegations of the Champagne Metals suit, that it had breached that duty, and that it should be estopped from asserting any policy defenses to coverage based on that breach. In Count II, Ryerson asserted a claim for breach of contract based on the same conduct by Travelers. In Count VII of its first amended complaint, Ryerson asserted that it was entitled to a remedy under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2014)) based on Travelers' conduct with respect to the Champagne Metals suit.

¶ 12    The trial court dismissed Count VII on the basis that it was not filed within the applicable statute of limitations. It granted a motion for summary judgment in favor of Travelers on Counts I and II, concluding that under the policy at issue Travelers owed no duty to defend Ryerson in the Champagne Metals suit. Ryerson timely appeals these orders of the trial court.

¶ 13                                B. Hoffman Suit

¶ 14    The underlying facts of the Hoffman suit are set forth in greater detail in this court's order in *Hoffman*, 2014 IL App (1st) 122793-U. The case arose from a July 21, 2002, collision involving a tractor-trailer driven by Dorlan Crane and an automobile driven by Nancy Hoffman, in which her daughter was a passenger. *Id.* ¶ 4. Ryerson was the producer of steel coils that Crane had been hauling at the time of the collision. *Id.* On June 30, 2003, Ryerson was named as a defendant on the basis that Crane had been acting as Ryerson's agent when the collision occurred. *Id.* The plaintiffs' theory of liability against Ryerson was that it was engaged in a joint venture with Crane's employer and a logistics company, and that Crane was acting as its agent. *Id.* ¶ 6. Ryerson tendered the suit for defense, and both Travelers, as its primary insurer, and Illinois National, as its excess insurer, became involved in Ryerson's defense of that suit. Ryerson's policy limits under its pertinent policy with Travelers was $2 million, and it had an additional $25 million in

commercial umbrella liability coverage with Illinois National. On February 10, 2012, a jury returned a verdict in favor of the Hoffman plaintiffs and against Ryerson and its codefendants in the amount of $27,672,152. *Id.* ¶ 25.

¶ 15    According to the pertinent counts of Ryerson's first amended complaint in this case (Counts III, V, and VIII), unspecified problems arose in the handling of the defense in the trial court by Tressler, LLP, who defended Ryerson from 2003 to 2010. Travelers then agreed, at the insistence of Illinois National, that the law firm of Patton & Ryan substitute as defense counsel on behalf of Tressler. Patton & Ryan advised Travelers that the potential verdict range was between $8-15 million, and the Hoffman plaintiffs' settlement demand was $17 million. During this time, Travelers offered no more than $250,000 toward settlement. The case went to trial in February 2012. However, John Patton, who had been the lead trial attorney for Ryerson from the Patton & Ryan law firm, was engaged in a different trial and did not appear or participate in the full trial of the Hoffman case. As stated above, a verdict in excess of $27 million was issued. Posttrial motions were timely filed.

¶ 16    On February 28, 2012, Charles Patitucci, who handled this claim on behalf of Illinois National,[2] spoke to Pam Kasbohm, who handled the claim on behalf of Travelers, about which law firm would act as lead appellate counsel for Travelers. Illinois National's choice was Clausen Miller, but Travelers wanted Pretzel & Stouffer. According to Patitucci's notes of this conversation, which are attached as an exhibit to the first amended complaint, Kasbohm told him that one of the reasons that Travelers wanted Pretzel & Stouffer was because "they have a very

---

[2] The record reflects that an entity called "Chartis" handled the claim on behalf of Illinois National, and that both are American International Group (AIG) companies. Although some allegations and correspondence refer to or involve Chartis and AIG, for simplicity in this order we refer to them always to Illinois National. We further note that all of Ryerson's claims in this case against Illinois National were dismissed pursuant to settlement, and therefore we set forth the allegations concerning Illinois National only to the extent they involve Ryerson's allegations against Travelers.

large book of business in the Chicago area that deals with agency[3] and they want to ensure that this case is defended with [attorneys] they are familiar and comfortable with."

¶ 17    On June 18, 2012, Illinois National sent a reservation of rights letter to Ryerson "in light of recent developments in the Hoffman lawsuit." It cited a joint venture limitation endorsement in Ryerson's policy with Illinois National which, it contended, might apply to reduce the available policy limits to less than $25 million.

¶ 18    On June 20, 2012, attorneys on behalf of Illinois National sent to Travelers a letter, again insisting that "Clausen Miller serve as lead post-trial and appellate counsel in the Hoffman Lawsuit." The letter pointed out that "Travelers may have a duty to defend, but that duty does not trump [Illinois National's] right to control the handling of a case where the liability greatly exceeds the limits of the Travelers Policy." It also threatened that Travelers was jeopardizing Ryerson's duty of cooperation under its policy with Illinois National. On July 26, 2012, the attorneys for Illinois National followed up with a second letter reiterating their position. On August 6, 2012, an attorney for Travelers responded to the attorneys for Illinois National that Travelers' policy gave Travelers the " 'right and duty' to defend Ryerson in this matter," and Illinois National had no corresponding right until the applicable limits of underlying insurance was exhausted, which was not the case.

¶ 19    On August 17, 2012, Illinois National's attorneys sent a letter to Ryerson and Travelers informing them that Illinois National had "no obligation to pay the premium for an appeal bond, to procure an appeal bond, or to pay interest accruing on the judgment in the Hoffman Lawsuit." It stated that the Illinois National policy "assumes no obligation regarding appeal bonds unless

---

[3] This reference to "agency" apparently refers to one of the issues involved in the appeal of the underlying case, whether Ryerson as a shipper of a product could be held liable on an agency theory for the actions of a driver. See *Hoffman*, 2014 IL App (1st) 122793-U, ¶¶ 30-39.

[Illinois National] has 'assume[d] the defense' of the claim or suit, which it has not done." It further referenced the policy's joint venture limitation endorsement as an additional reason why it "will not be posting the Illinois National Policy for security in lieu of a bond on any appeal in the Hoffman Lawsuit." It stated that the obligations to procure and pay premiums for appeal bonds "fall entirely to Ryerson itself or to Travelers."

¶ 20    On August 28, 2012, the trial court denied the post-trial motions of Ryerson and its codefendants, granted a motion to stay enforcement of the judgment through September 24, 2012, and continued the case to September 26, 2012, for the setting of the amount of appeal bond. On September 26, 2012, the trial court set the amount of the appeal bond at $37 million, granted Ryerson and the other defendants an extension of time through October 18, 2012, to present appeal bonds or other security, and stayed execution of the judgment until that date.

¶ 21    At some point prior to September 27, 2012, Ryerson hired independent coverage counsel. On that date, one of Ryerson's coverage attorneys sent a letter to the attorneys representing Illinois National, asserting that Illinois National's post-verdict reservation of rights was inconsistent with the provisions of its policy and its obligations of good faith to its insured. The letter further asserted that as long as Illinois National intended to keep Ryerson guessing about whether it was covered for its full $25 million policy limits, "Ryerson will not turn over control of the defense of the post-judgment proceedings and appeal to [Illinois National]." The letter continued, "At this point, Ryerson has the committed $2 million from Travelers without strings, as [Illinois National] improperly now tries to attach, so it will be for Ryerson and Travelers to decide how to proceed."

¶ 22    On October 16, 2012, the trial court granted another extension, staying the execution of the judgment to November 8, 2012. On November 7, 2012, a motion was presented on behalf of Ryerson to approve the insurance policies of Travelers and Illinois National as bond and to stay

execution of the judgment pending appeal. Attached to that motion were affidavits of representatives of Travelers and Illinois National confirming that the respective policies were applicable to and did together cover the liability of Ryerson for the remainder of the judgment entered against it, along with post-judgment interest. The trial court granted this motion.

¶ 23  Ryerson alleges that, after the verdict until November 7, 2012, it "could not get straight answers" from Travelers or Illinois National about which insurer controlled its defense, which law firm would be handling its defense, the insurers' respective responsibilities for post-judgment interest, the insurers' respective responsibilities for securing an appeal bond, and how Ryerson was being protected by the two insurance companies while they were engaged in disputes between themselves. It alleges that from August 2012 until November 2012, it faced the prospect of having its bank accounts frozen and assets seized if an appropriate appeal bond was not secured. It alleges that obtaining an appeal bond on its own would cost it "in excess of $20 million in premium," or with a letter of credit it would have been required to post $22 million and pay nearly a quarter of a million dollars in handling costs. Ryerson also alleges that during this time, it was engaged in a major company debt refinancing that was adversely impacted by the two insurers' conduct, which required it to engage various professional advisors regarding the adverse effect of its need to expend such substantial sums on an appeal bond and potential open liability. It alleges that it was required to obtain its own coverage counsel to deal with the two insurance companies and ensure that they properly complied with the obligations they owed to Ryerson. It alleges that it needed to retain the law firm of Mayer Brown L.L.P. as independent counsel as to the defense to protect Ryerson's interests post-judgment and for appeal while the two insurers disputed over the defense and their respective obligations.

¶ 24  Ryerson alleges that Travelers, despite its insistence on controlling the defense on appeal,

took no steps from February 14, 2012, until November 7, 2012, to secure an appeal bond or other security for Ryerson and instead maintained that it was responsible only for premiums toward an appeal bond of $2 million. It alleges that Travelers knew that Illinois National, as the excess insurer, would not assist Ryerson with an appeal bond or with the payment of any appeal bond premiums or other security unless and until Travelers tendered its $2 million limits to Illinois National and turned over control of Ryerson's defense. Ryerson alleges that, absent the posting of an approved appeal bond or other appropriate and approved security, it was exposed to imminent proceedings to attach its assets for over $27 million.

¶ 25    Ryerson alleges that Travelers had a duty to disclose conflicts to it and to ameliorate those conflicts to ensure that it was providing a proper and effective defense, including by paying the fees of independent defense counsel chosen by Ryerson. Its complaint cites *Perma-Pipe, Inc. v. Liberty Surplus Insurance Corp.*, 38 F. Supp. 3d 890 (N.D. Ill. 2014), for the principle that a " 'conflict arises from the relation of the policy limit to the insured's potential liability' including any 'non-trivial probability' of exposure to the insured." Ryerson alleges that Travelers' defense of Ryerson was ineffective because Travelers was essentially defending only its own $2 million policy limits and its "very large book of business" on other agency accounts while leaving Ryerson exposed for over $25 million excess of Travelers' policy limits and to attachment proceedings on Ryerson's assets under the judgment.

¶ 26    Ryerson also alleges that Travelers was aware that, after the verdict in the Hoffman case, Illinois National had "attempted to 'reserve rights' to disavow a portion of the Hoffman judgment, such that Ryerson also was separately exposed to potential uninsured liability above Travelers' limits, but Travelers still did not cede control of the Hoffman defense, tender its $2 million in policy limits, or take other necessary measures to protect Ryerson." It alleges that, from February

14, 2012, to late October or early November 2012, Travelers never tendered its $2 million limits, advised Ryerson of its right to independent counsel or agreed to pay for such counsel, or otherwise ceded control of Ryerson's defense to Illinois National. It alleges that instead, Travelers sought to make Ryerson a "guinea pig" for purposes of Travelers' other business interests while simultaneously attempting to insulate Travelers from the adverse consequences or have Ryerson improperly bear the huge financial payout.

¶ 27 Ryerson's first amended complaint then contains the following final paragraph of its Count III for breach of contract:

"Travelers breached both its duty to defend and duty to indemnify Ryerson by failing to provide Ryerson with an effective defense during the course of the Hoffman suit including the need to change defense counsel multiple times and mid-case, assigning a second defense counsel whose lead trial attorney failed to appear to conduct the full Hoffman trial and abdicated at the eleventh hour, not keeping Ryerson apprised of all important developments during the course of the Hoffman litigation (with reports and other key communications routinely only being provided to insurer representatives and not to Ryerson), and ultimately causing a judgment of over $27 million to be entered against Ryerson on February 14, 2012. Travelers further breached its duties to defend and indemnify post-judgment by improperly insisting on controlling Ryerson's defense for its [Traveler's] own financial self-interests which were placed ahead of Ryerson's interests as the policyholder to be protected (and notwithstanding Travelers owing a fiduciary duty toward Ryerson). This was done without advising Ryerson of Traveler's 'conflicts of interests.' Travelers also breached its dual duties by failing to undertake any genuine effort toward resolution other than a pre-trial (certain to be rejected) token $250,000 amount.

Travelers then continued its intransigence post-trial, despite the over $27 million judgment. Travelers refused to undertake discussions even at the direction of the trial court, and from February 14, 2012 until November 7, 2012 withheld the tender of its $2 million policy limits (with the over $27 million judgment looming over Ryerson's head and for which Ryerson stood legally liable) while Ryerson ultimately was forced to secure, retain, and pay for its own independent defense counsel (for which Travelers should have been paying) and take steps to try to mitigate the exposures, liability, and losses that Ryerson faced because of Travelers' breaches. Included in the harm caused to Ryerson were the costs, fees, and expenses incurred to try to secure a $37 million bond, as Travelers' breaches left Ryerson exposed to imminent attachment proceedings against its assets. Ryerson suffered other resulting expenses, losses, fees, and costs, including as to Ryerson's then occurring major debt refinancing and public offering of which Travelers was aware and forewarned, but nevertheless disregarded (Ryerson's ongoing business and financing having been impacted by the abrupt need to disclose, and secure, the very large $37 million amount that properly was to be covered by the insurers as was only belatedly and finally done on November 7, 2012, but which from February 2012 to November 7, 2012 had been obstructed by Travelers and its breaches of its duties to Ryerson). By not discharging its duties and obligations to Ryerson throughout the Hoffman suit, and instead botching, concealing, undermining, prejudicing, refusing, and otherwise failing to take necessary action until November 7, 2012, Travelers breached its duties and policy obligations to Ryerson and caused Ryerson's resulting, foreseeable, and recoverable damages and losses as a consequence of said breaches for which Travelers is liable to Ryerson."

¶ 28      Count V of Ryerson's first amended complaint alleges that it is entitled to relief under

section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2014)). Count V incorporates all of the allegations above. It then engages in a lengthy discussion of legal arguments made by Travelers in a brief from an unrelated case that Travelers filed in federal court in the Eastern District of Pennsylvania, which we need not set forth. Finally, it alleges that Travelers engaged in vexatious and unreasonable conduct by "stalling and not responding to a stipulation to have Ryerson dismissed" from other coverage litigation arising from the Hoffman suit, Lincoln General Insurance Co. v. Joseph T. Ryerson & Son, Inc., et al., No. 1:14-cv-8446 (N.D. Ill.).

¶ 29    Count VIII of Ryerson's first amended complaint alleges that Travelers' conduct violated the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2014)). Count VIII again incorporates the allegations of all counts that precede it. It alleges that after the verdict was entered against Ryerson, Travelers falsely misrepresented to it that Travelers's $2 million policy limits had been committed to protect Ryerson, that the interest of Travelers and Ryerson were completely aligned, and that Illinois National was the sole source of obstruction and detriment to Ryerson because Illinois National was uninterested in an offer of Travelers's policy limits and only wanted Travelers to continue to fund a defense that Illinois National could control. It alleges that Travelers's senior counsel sent a misleading and untruthful letter to the attorneys for Illinois National rejecting case law (apparently a reference to *Nandorf, Inc. v. CNA Insurance Companies*, 134 Ill. App. 3d 134 (1985)), that where a conflict of interest exists, "it would be improper for the insurer to retain control of the litigation, and that the insurer was required to pay for independent counsel." It alleges this statement is misleading given the conflicts of interest that existed between Travelers and Ryerson. Ryerson alleged that it relied on Travelers's false statements, misrepresentations, and improper concealment of critical information, including subsequently when Ryerson incorrectly informed Illinois National that "Ryerson has the committed $2 million from Travelers without

strings," as Ryerson said this when believing incorrectly that its interests were aligned with Travelers. Count VIII also alleges that Travelers concealed from Ryerson that Illinois National had repeatedly asked Travelers whether it was going to offer its policy limits, and Travelers repeatedly declined to do so as late as October 7, 2012. It alleges that, during meetings in the days that followed among representatives of Ryerson, Travelers, and Illinois National, Travelers "continued to convey and to dupe Ryerson that supposedly all of the blame and improper conduct belonged with Illinois National alone," never revealing the full extent of Travelers's own serious misconduct.

¶ 30    Travelers moved to dismiss Counts III, V, and VIII of the first amended complaint. The trial court dismissed Count III on the basis that the contractual duty to defend and indemnify were not breached where Travelers defended Ryerson throughout the lawsuit and paid its coverage limits on Ryerson's behalf. It noted that Ryerson was ultimately fully protected when the two policies were put up as an appeal bond. It stated that Ryerson could not bring "the equivalent of a malpractice cause of action against the insurance company because they didn't provide effective defense counsel, or you're in disagreement with the outcome." It dismissed Count V on a similar basis, reasoning that section 155 of the Insurance Code is not a "quasi malpractice" statute "that provides all insureds a cause of action whenever there are deficiencies alleged against the insurer in the course of the insurer providing a duty to defend." It dismissed Count VIII on the basis that the facts alleged could never support relief under the Consumer Fraud Act. In doing so, it denied the plaintiff's oral request to file a second amended complaint. The plaintiff appeals these rulings of the trial court.

¶ 31                                    II. ANALYSIS

¶ 32                                A. Champagne Metals Suit

¶ 33      With respect to the Champagne Metals suit, Ryerson's primary argument on appeal is the trial court erred in finding that Travelers did not have a duty to defend Ryerson in that suit. Our review is *de novo*, as this issue was decided on summary judgment and the construction of an insurance policy presents a question of law. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 360 (2006). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018).

¶ 34      To determine whether an insurer has a duty to defend its insured in a lawsuit, the court must compare the facts alleged in the underlying complaint to the relevant provisions of the insurance policy. *Valley Forge Insurance*, 223 Ill. 2d at 363. If the underlying complaint alleges facts within or potentially within the coverage of the policy, the insurer is obligated to defend its insured even if those allegations are groundless, false, or fraudulent. *General Agents Insurance Co. of America, Inc. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155 (2005). An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage. *Valley Forge Insurance*, 223 Ill. 2d at 363. Moreover, if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy. *General Agents Insurance*, 215 Ill. 2d at 155.

¶ 35      We construe the underlying complaints liberally in favor of the insured. *Id.* If the words used in the policy, given their plain and ordinary meaning, are unambiguous, they will be applied as

written. *Valley Forge Insurance Co.*, 223 Ill. 2d at 363. We give little weight to the legal label that characterizes the underlying allegations. Instead, we determine whether the alleged conduct arguably falls within at least one of the categories of wrongdoing listed in the policy. *Illinois State Bar Ass'n Mutual Insurance Co. v. Cavenagh*, 2012 IL App (1st) 111810, ¶ 14. The duty to defend does not require that the complaint allege or use language affirmatively bringing the claims within the scope of the policy. *Id.* The question of coverage does not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action. *American Economy Insurance Co. v. Holabird & Root*, 382 Ill. App. 3d 1017, 1022 (2008). The threshold for a pleading to give rise to the duty to defend is low. *Id.* at 1023.

¶ 36       The Travelers policy at issue provides in pertinent part that Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' *** to which this insurance applies," that it "will have the right and duty to defend the insured against any 'suit' seeking those damages," and that it "will have no duty to defend the insured against any 'suit' seeking damages for 'personal injury' *** to which this insurance does not apply." The policy provides that " '[p]ersonal injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses: *** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."

¶ 37       Ryerson argues on appeal that Travelers had a duty to defend it in the suit filed against it by Champagne Metals. It argues that, when liberally construed and under federal standards of notice pleading, the underlying complaint contains allegations that Ryerson made disparaging statements about the services of Champagne Metals, a covered offense under the policy's definition of "personal injury." It cites the factual allegation in the underlying complaint accusing Ryerson of

" 'expressing disapproval to certain aluminum mills of any intent, plan, or consideration to add Champagne Metals as a distributor or to sell aluminum to Champagne Metals.' " It argues that this allegation that it expressed "disapproval" is synonymous with an allegation of disparagement. It further cites the allegations that Champagne Metals was injured and lost business as a result of this conduct, specifically the allegation that customers have determined not to purchase aluminum products from Champagne Metals because of the underlying defendants' conduct. And it cites to the allegation that " 'an officer of one of the Defendants stated that Champagne Metals is the biggest mistake in the last 30 years of his career,' " which Ryerson characterizes as "[a]n example of these disapproving statements about Champagne Metals and its distributor services."

¶ 38    For its part, Travelers argues that the underlying complaint does not state even a potential claim of disparagement because it does not allege that any false statement was made, it does not allege that a statement was made about the goods, products, or services of Champagne Metals, and it does not allege that any statement was made to the buying public. Travelers argues that, to the contrary, the underlying complaint alleged that Ryerson and its codefendants pressured aluminum suppliers not to sell products to Champagne Metals, which curtailed its ability to do business. It further alleges that the underlying complaint cannot be construed to allege injury "arising out of" any disparaging statement or publication.

¶ 39    To constitute a covered offense within the terms of the policy at issue, we would have to find, under the theory advanced by Ryerson, that the underlying complaint potentially alleges an "injury *** arising out of *** [o]ral or written publication of material that *** disparages a[n] *** organization's goods, products or services." The word "disparages" is not defined in the policy. This court has defined disparagement as " 'words which criticize the quality of one's goods or services.' " *Green4All Energy Solutions, Inc. v. State Farm Fire & Casualty Co.*, 2017 IL App

(1st) 162499, ¶ 26 (quoting *Lexmark International, Inc. v. Transportation Insurance Co.*, 327 Ill. App. 3d 128, 140 (2001)). " 'To qualify as disparagement, there must be statement[s] about a competitor's goods which [are] untrue or misleading and [are] made to influence or tend to influence the public not to buy.' " (Brackets in original.) *Id.* (quoting *Lexmark International*, 327 Ill. App. 3d at 140). "To qualify as disparagement, '[t]he statement (1) must be about a competitor's goods or services, (2) must be untrue or misleading, and (3) must have been made to influence or tend to influence the public not to buy those goods or services.' " *Id.* ¶ 27 (quoting *Pekin Insurance Co. v. Phelan*, 343 Ill. App. 3d 1216, 1220 (2003)).

¶ 40      We find that the underlying complaint does not allege injury arising out of any statement or publication that "disparages" the goods, products, or services of Champagne Metals. The first allegation that Ryerson cites, which it contends constitutes a covered allegation of disparagement, alleges in its entirety as follows:

> "The aforesaid conspiracy consists of an agreement, understanding, and concerted action among the Defendants to include and coerce aluminum mills (suppliers) to deny Champagne Metals a relationship needed to compete, the substantial terms of which are:
>
> a)      expressing disapproval to certain aluminum mills of any intent, plan, or consideration to add Champagne Metals as a distributor or to sell aluminum to Champagne Metals."

However, this allegation is not alleging that Ryerson or any co-conspirator made a statement about the goods, products, or services of Champagne Metals. Rather, the "disapproval" expressed to the aluminum mills was of the prospect that they would do business with a new competitor in the industry, by adding Champagne Metals as a distributor or by selling aluminum to it. The disapproval expressed was not about the goods, products, or services of Champagne Metals.

¶ 41    The other example Ryerson cites of an allegation of a disparaging statement about Champagne Metals and its distributor services is the allegation that "an officer of one of the Defendants stated that Champagne Metals is the biggest mistake in the last 30 years of his career." Again, however, this is not an allegation about a statement concerning the goods, products, or services of Champagne Metals. This statement appears in the context of an allegation that the defendants' conduct is injurious to competition in the relevant market. (See *supra* ¶ 7.) The allegation refers to the fact that the defendants "each have a long history in the metals business and wield substantial power in the relevant market," and that as a result of a conspiracy among them that is well known in the industry, other potential competitor service centers have been deterred from entering the market. It then alleges, "[i]n fact, upon information and belief, an officer of one of the Defendants stated that Champagne Metals is the biggest mistake in the last 30 years of his career, and that if he had known about Champagne Metals on the day it started, he would have stopped it from entering the market." Its context makes it evident that this statement refers to the "mistake" of allowing a new competitor, Champagne Metals, to enter the market, and in not stopping it from doing so when it first began operating. It is not referring to the goods, products, or services of Champagne Metals as being a "mistake."

¶ 42    Ryerson argues that these allegations in the underlying complaint are no less suggestive of the potential for coverage than those that gave rise to an insurer's duty to defend in *Phelan*.[4] The policy in *Phelan* provided coverage for advertising injuries, which were defined to include oral or written statements that disparage an organization's goods, products, or services. *Phelan*, 343 Ill.

---

[4] Ryerson also relies extensively upon a nonprecedential order of this court entered under Illinois Supreme Court Rule 23(b) (eff. Apr. 1, 2018). Its citation to this nonprecedential order is inappropriate. An order entered under Rule 23(b) "is not precedential and may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S. Ct. R. 23(e)(1) (eff. April 1, 2018). Ryerson does not contend that the order falls within one of these exceptions.

App. 3d at 1219. The underlying complaint alleged that the insured, a hair salon owner, had falsely told customers that the underlying plaintiff ("Imaginations on Hair," which was a competitor hair salon and the insured's former employer) was moving to a new location and given them the address of her new salon, had made appointments for Imaginations' customers at her new salon, and had told customers that Imaginations was closing. *Id.* at 1218. The court found that these allegations alleged the offense of disparagement within the coverage of the policy. *Id.* at 1221. It found that the insured's statements were about Imaginations' services, in that they implied that Imaginations was ceasing its services and leaving its current location. *Id.* It found that the statements were alleged to be untrue and misleading by the underlying complaint *Id.* And it found that the statements were made to induce customers not to use Imaginations' services in the future, by suggesting that they would be unavailable. *Id.*

¶ 43        We find the allegations at issue in this case to be readily distinguishable from those of *Phelan*. In *Phelan*, the court found that the alleged statements pertained to the services of a competitor by falsely implying that the competitor was going to cease providing those services soon. In this case, as discussed above, the statements in the underlying complaint relied upon by Ryerson are not statements about the services of Champagne Metals. There is nothing in the underlying complaint alleging statements that were false or misleading. Although the statements may have been intended to induce the aluminum mills not to do business with Champagne Metals, they did not purport to do so on the basis that they were untrue or misleading statements about its services.

¶ 44        Ryerson argues that the title of the third count of the underlying compliant, interference with business or contractual relations, is a state law claim that is recognized under Oklahoma law to be the same as a disparagement claim. See *Yousuf v. Cohlmia*, 718 F. Supp. 2d 1279, 1286 (N.D. Okla. 2010) ("the tort of interference with business relationships is also known as disparagement").

Travelers responds that, although courts have recognized that it is possible for a tortious interference claim to be based on a disparaging statement, this does not mean that tortious interference and disparagement are always the same thing. See *id.* at 1286-87 ("policy language referencing 'the offense' of 'the publication of … other defamatory or disparaging material' is broad enough to support coverage of *certain claims* for intentional inference with contract or business relations" (Emphasis added)). We agree with Travelers. Here we are dealing with a policy that provides coverage for injury arising out of the publication of material that disparages an organization's goods, products, or services. As discussed above, the count in the underlying complaint for interference with business or contractual relations did not allege that Champagne Metals suffered injury arising out of a statement that disparaged its goods, products, or services. Therefore, although we do not disagree that a claim for inference with business or contractual relations could be based on a disparaging statement about a competitor's goods, products, or services and therefore within the coverage of the policy, that is not the situation in this case.

¶ 45    Ryerson further contends that this court should consider, in its analysis of whether a duty to defend existed, certain statements that were included by the district court in its order granting summary judgment and certain statements in the deposition of Larry Hull in the underlying case. These were not alleged in the underlying complaint. As part of the district court's order setting forth the evidence about whether Ryerson had participated in a conspiracy, it referenced a statement attributed by a Commonwealth employee to Ryerson representative Phil Wylie during an " 'impassioned discussion' about Champagne Metals," in which "Mr. Wiley reiterated his belief that [Champagne Metals] did not meet the distributor criteria." See *Champagne Metals*, 2004 WL 7318834, at *17. Ryerson also cites Hull's deposition testimony that "people have taken shots at" Champagne Metals, "in a point where we couldn't service the account or we weren't able to do

it." Asked to elaborate, Hull stated that when Champagne Metals was trying to do business with Acme Engineering, Ryerson "expressed that we couldn't do the business and if they gave it to us we would fail doing the business."

¶ 46    Travelers contends that it would be inappropriate for this court to rely on these statements because they are outside of the allegations of the underlying compliant. We agree. We acknowledge Ryerson's argument that a court may, under certain circumstances, look beyond the allegations of the underlying compliant to determine whether an insurer has a duty to defend. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 459 (2010). A court is not required to " 'wear judicial blinders and may look beyond the complaint at other evidence appropriate to a motion for summary judgment.' " (Internal quotation marks omitted.) *Id.* at 461 (quoting *Holabird & Root*, 382 Ill. App. 3d at 1032). However, while a court is permitted to consider information outside the complaint when determining a duty to defend, doing so remains an exception to the general rule that the duty to defend is determined from the factual allegations of an underlying compliant. *Pekin Insurance Co. v. Precision Dose, Inc.*, 2012 IL App (2d) 110195, ¶¶ 36-37, 41.

¶ 47    We see no reason to consider the statements by Wiley or Hull as bearing on the duty to defend. The district court's summary judgment order does not discuss Wiley's statement in any way that indicates that, notwithstanding the allegations of the complaint, Champagne Metals actually sought to impose liability on the basis that Wiley's statement was disparaging to the goods, products, or services of Champagne Metals or that Champagne Metals' injury arose out of this. The district court set forth Wiley's statement in its discussion that the complaints made to Commonwealth about its relationship with Champagne Metals were evidence that Ryerson participated in a conspiracy. The statement's purported relevance was that it was anticompetitive in nature, not that it was disparaging. Likewise, there is no indication that Champagne Metals

- 23 -

actually sought to impose liability on Ryerson based on the isolated statement from Hull's deposition. Thus, we see no reason why these statements from outside the complaint should be considered in our analysis of the duty to defend in this case.

¶ 48   For the above reasons, we hold that the trial court correctly determined that Travelers did not have a duty to defend Ryerson in the Champagne Metals case under the policy at issue. We therefore affirm the trial court's granting of summary judgment in favor of Travelers on Count I for declaratory judgment and Count II for breach of contract involving the Champagne Metals suit.

¶ 49   Our conclusion that Travelers had no duty to defend Ryerson against the allegations of the Champagne Metals suit renders moot the question of whether a remedy could be imposed on Travelers under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2014)) for its conduct relative to the Champagne Metals suit. Where, as here, no coverage is owed under the policy, there can be no finding that the insurer acted vexatiously or unreasonably with respect to the claim. *Rhone v. First American Title Insurance Co.*, 401 Ill. App. 3d 802, 815 (2010); *Martin v. Illinois Farmers Insurance*, 318 Ill. App. 3d 751, 764 (2000) (insurer "cannot be liable for section 155 relief where no benefits are owed"); see also *Green4All Energy Solutions*, 2017 IL App (1st) 162499, ¶ 37. Thus, even though the trial court dismissed the claim seeking relief under section 155 on the basis that it was not filed within the statute of limitations, we need not address this issue as liability could not be imposed under section 155 in any event.

¶ 50                              B. Hoffman Suit

¶ 51   With respect to the Hoffman suit, Ryerson's argument on appeal is that the trial court erred in dismissing with prejudice the counts of its first amended complaint alleging breach of contract (Count III), for a remedy under section 155 of the Insurance Code (Count V), and for violations of the Consumer Fraud Act (Count VIII). Although Travelers moved for dismissal under both

sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2014)), it appears that the trial court dismissed each count under section 2-615. A motion to dismiss under section 2-615 attacks the legal sufficiency of a complaint. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). The critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004). All facts apparent from the face of the pleadings, including the exhibits attached thereto, are considered. *Green*, 234 Ill. 2d at 491. A court considering such a motion accepts as true all well-pleaded facts in the compliant and all reasonable inferences that may be drawn from those facts. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). We apply *de novo* review to an order granting a motion to dismiss under section 2-615. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003).

¶ 52                              1. Count III for Breach of Contract

¶ 53        On appeal, Ryerson focuses its argument concerning breach of contract on the existence of a conflict of interest between it and Travelers. It argues that, based on the existence of this conflict, Travelers breached its duty to defend by failing to advise Ryerson of its right to hire independent counsel at Traveler's expense. Although we find Ryerson's argument to be less than precisely clear, we discern its argument to be that a conflict of interest arose post-judgment because Travelers was essentially defending only its own $2 million policy limits and its "large book of business" in other accounts that would benefit from a favorable appellate decision on the issue of agency involved in that case. Travelers did so, Ryerson contends, while leaving Ryerson exposed to the potential attachment of its assets, based on the fact that Illinois National was refusing to commit to fully protecting Ryerson until Travelers ceded it control of the defense.

¶ 54        The contract provision allegedly breached is Traveler's contractual duty to defend Ryerson.

Ordinarily, an insurer's duty to defend its insured includes the right to control the defense, which allows insurers to protect their financial interest in the outcome of the litigation. *Xtreme Protection Services, LLC v. Steadfast Insurance Co.*, 2019 IL App (1st) 181501, ¶ 19 (citing *Illinois Masonic Medical Center v. Turegum Insurance Co.*, 168 Ill. App. 3d 158, 163 (1988)). A limited exception to this rule exists where a conflict of interest arises between the insurer and insured. *Williams v. American Country Insurance Co.*, 359 Ill. App. 3d 128, 137-38 (2005). Where a conflict exists, the insured, rather than the insurer, is entitled to assume control of the defense of the underlying action. *Illinois Masonic Medical Center*, 168 Ill. App. 3d at 163. If this occurs, the insurer satisfies its obligation to defend by reimbursing the insured for the cost of defense provided by independent counsel selected by the insured. *Standard Mutual Insurance Co. v. Lay*, 2014 IL App (4th) 110527-B, ¶ 35 (citing *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 198-99 (1976)).

¶ 55        One situation in which a conflict may exist giving rise to an insured's right to independent counsel paid for by the insurer is where the insurer is obligated to provide defenses to multiple insureds who have adverse interests. *Illinois Municipal League Risk Management Ass'n v. Seibert*, 223 Ill. App. 3d 864, 872 (1992) (citing *Murphy v. Urso*, 88 Ill. 2d 444, 452 (1981)). Another is a situation in which proof of certain facts in the underlying action would shift liability from the insurer to the insured. *Id.* at 873 (citing *Maryland Casualty*, 64 Ill. 2d at 197, and *Thorton v. Paul*, 74 Ill. 2d 132, 152 (1978)); *American Family Mutual Insurance Co. v. W.H. McNaughton Builders, Inc.*, 363 Ill. App. 3d 505, 511 (2006) ("if, in the underlying suit, insurer-retained counsel would have the opportunity to shift facts in a way that takes the case outside the scope of policy coverage, then the insured is not required to defend the underlying suit with insurer-retained counsel").

¶ 56        Ryerson has not cited any case from the reviewing courts of this state recognizing a conflict in a situation similar to that of this case that has been found to give rise to the right to independent

counsel. Rather, Ryerson argues that Travelers committed the same breach of the duty to defend that the federal district court found was a breach of contract in *Perma-Pipe*, the case cited in its first amended complaint. In that case, the insured was a pipe manufacturer that was sued by a university seeking damages in excess of $40 million. *Perma-Pipe*, 38 F. Supp. 3d at 892. The insured's policy limits were $1 million per occurrence and $2 million aggregate. *Id.* Initially, the insurer agreed to defend the insured in the lawsuit under a reservation of rights. *Id.* Because this reservation caused a conflict of interest between the parties, the insured selected independent counsel to handle its defense. *Id.* Several months later, the insurer withdrew its reservation of rights and sought to substitute defense counsel selected by the insurer. *Id.* at 892-93. The insured contended that a conflict still existed due to the possibility of a judgment or settlement far in excess of the insured's policy limits and that this conflict should enable it to continue to be represented by its counsel of choice at the insurer's expense. *Id.* at 893. When the insurer refused to agree, the insured sued for breach of contract. *Id.* The district court granted summary judgment in favor of the insured, finding that a conflict existed and that the insurer breached its duty to defend by refusing to pay for independent counsel of the insured's choosing. *Id.* at 896. In explaining the basis for its conclusion that a conflict existed, the district court stated:

> " 'The usual conflict of interest involves the insurance company's denying coverage, but the principle is the same when the conflict arises from the relation of the policy limit to the insured's potential liability.' *R.C. Wegman Construction Co. v. Admiral Insurance Co.*, 629 F.3d 724, 729 (7th Cir. 2011). In other words, because an insurer's exposure is capped by the policy limit, it may decide to try claims exceeding the limit, hoping that the resulting liability, if any, will be less, despite the risk that its insured could be found liable for an amount far greater than the limit. *Id.* at 728. Thus, the *Wegman* court said, a conflict exists

when there is 'a nontrivial probability' of an excess judgment in the underlying suit. *Id.* at 730." (Internal punctuation omitted.) *Perma-Pipe*, 38 F. Supp. 3d at 895.

¶ 57    We disagree that *Perma-Pipe* mandates the finding that a conflict of interest existed in this case. As no conflict existed, Travelers did not breach its contractual duty to defend by failing to advise Ryerson of its right to hire independent counsel at Traveler's expense. The policy at issue in this case gave Travelers "the right and duty to defend" any suit seeking covered damages and provided that Travelers "may investigate and settle any claim or 'suit' as we consider appropriate." This is not a case where Travelers defended multiple insureds with interests adverse to one another or defended Ryerson under a reservation of rights. Travelers provided Ryerson with defense counsel at all stages of the litigation and appeal. We see no basis to conclude that Travelers had any interest in providing Ryerson with anything less than a vigorous defense of all allegations against it. See *Nandorf*, 134 Ill. App. 3d at 137 ("In determining whether a conflict of interest exists, Illinois courts have considered whether, in comparing the allegations of the complaint to the policy terms, the interest of the insurer would be furthered by providing a less than vigorous defense to those allegations."). The fact that Travelers had an interest in creating favorable precedent that would be useful in other cases involving its insureds does not negate the fact that Ryerson fully shared its interests in prevailing on appeal. Ryerson cites no contractual or legal authority that Travelers owed it a duty under these circumstances to tender its $2 million primary policy limits to Illinois National prior to the appeal. As Travelers had the duty to defend Ryerson in this litigation, it had the corresponding right to control the defense also. *Xtreme Protection Services*, 2019 IL App (1st) 181501, ¶ 19.

¶ 58    As a federal district court decision, *Perma-Pipe* is not binding authority on this court. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 30. To the extent it stands for the proposition that "a conflict

exists when there is 'a nontrivial probability' of an excess judgment in the underlying suit," thereby entitling an insured to retain independent defense counsel at the insurer's expense, we do not agree. See *Perma-Pipe*, 38 F. Supp. 3d at 895 (quoting *Wegman*, 629 F.3d at 730). It is axiomatic that many cases involve a "nontrivial probability" of a judgment in excess of the applicable policy limits that the insured could be personally responsible to pay. After all, the minimum policy limits required on an automobile liability policy in this state is only $25,000 (625 ILCS 5/7-203 (West 2018)), but the jurisdictional minimum value that a personal injury case must have to be filed in the Law Division of the Circuit Court of Cook County is $30,000 (see Cook County Cir. Ct. G.O. 1.2,2.1(a)(1)(i) (Sep. 15, 2017)). However, this fact alone does not trigger a conflict of interest entitling the insured to hire an independent defense attorney paid for by the insurer. See Couch on Insurance (3d ed.) § 202:30 ("The fact that the damages requested by the plaintiff in the underlying tort litigation exceed the limits of the insurance policy does not generally amount to a conflict of interest sufficient to require appointment of independent counsel."). Although it is appropriate and proper to inform the insured of the possibility of an excess judgment and to advise the insured to consult independent counsel regarding excess liability, it would not be at the insurer's expense. See *Allstate Insurance Co. v. Campbell*, 334 Md. 381, 397, 639 A.2d 652 (1994).

¶ 59        Informing the insured of the possibility of an excess judgment appears to have been the point of *Wegman*, the Seventh Circuit case upon which the district court in *Perma-Pipe* relied. In *Wegman*, an insured against whom a $2 million judgment had been entered appealed the dismissal of a complaint alleging that its insurer breached the implied contractual duty of good faith when, despite its knowledge of the underlying plaintiff's significant injuries and $6 million settlement demand, it failed to warn the insured of the possibility of a judgment in excess of the insured's $1 million policy limits. *Wegman*, 629 F.3d at 726-27. If its insurer had done so, the insured alleged

that it would have made a timely claim for coverage under a $10 million excess policy it had with a different insurer. *Id.* at 727. The insured alleged that when it first learned of the possibility of an excess judgment a few days prior to trial, its excess carrier denied its claim as untimely. *Id.* The Seventh Circuit noted that at oral argument, the insurer's attorney stated that, as the underlying case involved multiple codefendants, the insurer had been gambling that it could minimize the insured's liability below the 25 percent threshold at which it would be jointly liable for all the plaintiff's damages. *Id.* at 728 (citing 735 ILCS 5/2-1117 (West 2010)). The court noted that "[w]hen a potential conflict of interest between insured and insurer arises, the insurance company's duty of good faith requires it to notify the insured." *Id.* at 729. It went on to state that this principle applies "when the conflict arises from the relation of the policy limit to the insured's potential liability." *Id.* It stated that at that point, an insured would have the option of hiring an independent attorney at the insurer's expense. *Id.* The court went on to address and reject the insurer's argument that it had no duty to notify the insured of a potential conflict of interest, only an actual one, stating:

> "[The insurer] misunderstands 'conflict of interest.' The term doesn't mean that the conflicted party is engaged in conduct harmful to another party. It means that their interests are divergent, which creates a potential for such harm. *The conflict in this case arose when [the insurer] learned that an excess judgment* (and therefore a settlement in excess of the policy limits, as judgment prospects guide settlement) *was a nontrivial probability in [the underlying] suit.*" (Emphasis added.) *Id.* at 730.

It ultimately reversed the district court's dismissal of the insured's complaint. *Id.* at 731.

¶ 60        The Seventh Circuit then issued an opinion on denial of the insurer's petition for rehearing. *R.C. Wegman Construction Co. v. Admiral Insurance Co.*, 634 F.3d 371 (7th Cir. 2011). In that opinion, the court disagreed with the insurer's characterization of its holding as being that " 'where

there is a possibility of a verdict in excess of policy limits, there is a conflict of interest between the insurer and the insured.' " *Id.* at 371. The court noted that its finding of a conflict was based on the facts of the case as alleged in the complaint. *Id.* at 372. It reiterated that "when faced with the likelihood of an excess judgment[,] instead of notifying Wegman and allowing it to negotiate its own settlement, or at least notify its excess-insurance carrier, Admiral's lawyer gambled in obtaining a reduction in damages, on the basis of Illinois's joint-and-several liability statute, that would being the damages award against Wegman below Admiral's policy limit." *Id.* "Admiral's gamble created a conflict of interest that entitled Wegman to choose its own attorney to represent its interests, yet Admiral failed to warn Wegman of what it was doing." *Id.*

¶ 61    This case does not involve concerns similar to those involved in *Wegman*. It is undisputed that prior to the verdict, Ryerson was aware that the potential verdict and settlement value of the case exceeded the limits of Travelers's $2 million primary policy. Ryerson's excess insurer, Illinois National, was timely notified of the case and participated in Ryerson's defense. Further, by the time the alleged conflict arose, Ryerson was aware that the amount of the verdict exceeded the limits of Travelers's policy. Therefore, this is not a situation in which Travelers was "gambling" on reducing Ryerson's damages at trial or appeal to an amount within the primary policy limits without informing Ryerson about the possibility that the verdict amount could exceed those limits and that Ryerson could be responsible for paying the amount in excess of those limits. This situation did not give rise to a conflict of interest entitling Ryerson to independent defense counsel that would be paid for by Travelers.

¶ 62    We further recognize that, as a matter of law, Ryerson's assets were never actually exposed to attachment, despite its concerns that they could be. Following the verdict, Ryerson's attorneys filed timely posttrial motions, which had the effect of staying enforcement of the judgment until

those motions were resolved. 735 ILCS 5/2-1202(d) (West 2012). Further, Ryerson's attorneys successfully procured extensions on the enforcement of the judgment pending appeal and on the deadline for filing an appeal bond until such bond was successfully secured. In its ruling dismissing the breach of contract count, the trial court stated that, to the extent that the parties were not in agreement as to their obligation to tender their insurance policies for purposes of appeal bond, they could have presented the issue to the trial court for resolution. However, the parties were able to resolve this dispute on their own, and both insurance policies were ultimately committed in satisfaction of the appeal bond. The fact that there was for some time a dispute about the insurers' respective obligations does not amount to a breach of contract by Travelers, even if getting to this resolution required some involvement or expense on the part of Ryerson.

¶ 63    As noted above, Ryerson's argument concerning the dismissal of the breach of contract count focuses almost entirely on the existence of a conflict of interest between it and Travelers. Ryerson does, however, point out that Count III of the amended complaint "incorporated all of the prior allegations and exhibits of the original complaint and then expended on them with great additional detail in paragraphs 104(a)-104(z) with additional exhibits and documentary support." We acknowledge that Count III does appear to allege that Travelers breached the contract through a myriad of other conduct that Ryerson does not discuss or argue on appeal. (See *supra* ¶ 27.) However, we decline to consider whether any of these other factual allegations could support a cause of action for breach of contract, because Ryerson has not set forth in its brief any reasoned argument on this point. "[A] reviewing court is not simply a depository into which a party may dump the burden of argument and research." *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. A court of review is entitled to have the issues clearly defined and to be cited pertinent authority. *Id.* A point not argued or supported by citation to

relevant authority fails to satisfy the requirements of Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) and results in forfeiture. *Id.*[5]

¶ 64    For these reasons, we affirm the trial court's dismissal of Count III of the first amended complaint alleging breach of contract with respect to the Hoffman suit.

¶ 65                    2. Count V under Section 155 of the Illinois Insurance Code

¶ 66    Ryerson next argues that the trial court erred in dismissing Count V of its first amended complaint, which sought relief under section 155 of the Illinois Insurance Code based on the actions of Travelers concerning the Hoffman suit. 215 ILCS 5/155 (West 2014). That statute provides in pertinent part as follows:

> "(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
>
> > (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
> >
> > (b) $60,000;
> >
> > (c) The excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to

---

[5] Our comments concerning forfeiture apply with equal force to the points not argued by Ryerson concerning Counts V and VIII. Ryerson's brief points out that both of those counts include and incorporate all of the factual allegations, supporting documents, and exhibits of the counts that precede them. Both of these counts thus consist of well over 125 paragraphs of allegations. However, we confine our analysis to the specific arguments made by Ryerson in its brief on appeal.

pay in settlement of the claim prior to the action." *Id.* § 155(1).

"The statute provides an extracontractual remedy to policyholders whose insurer's refusal to recognize liability and pay a claim under the policy is vexatious and unreasonable." *Cramer v. Illinois Exchange Agency*, 174 Ill. 2d 513, 519 (1996). It is intended to penalize vexatious delay or the rejection of legitimate claims by insurance companies. *Estate of Price v. Universal Casualty Co.*, 334 Ill. App. 3d 1010, 1012 (2002). Its purpose is to discourage the insurer from using its superior financial position to profit at the insured's expense. *Id.* at 1016. A trial court must consider the totality of the circumstances when determining whether an insurer's conduct violates section 155. *Mohr v. Dix Mutual Country Fire Insurance Co.*, 143 Ill. App. 3d 989, 998 (1986).

¶ 67      On appeal, Ryerson contends that it properly pled a claim under section 155 based on Travelers's having deliberately mislead and deceived it, including about its conflicts of interests whereby Travelers placed its own financial interests ahead of ensuring that its policyholder was promptly and fully protected. It argues that Travelers improperly strung it along with representations that Travelers was aligned with and working for Ryerson toward reaching a resolution, when in reality Travelers was engaged in vexatious and unreasonable delay, which forced Ryerson to hire coverage counsel and expend substantial resources to secure Travelers's compliance. Ryerson argues that Travelers's conduct left it exposed to the threat of a $27 million judgment and to the attachment and liquidation of its bank accounts and assets. Ryerson contends that "there is no reason that Travelers could not, and did not, timely and properly tender its $2 million policy limits in February 2012, before Ryerson had to incur such fees and costs." It further argues that "no reason exists for Travelers having improperly delayed *** until November 7, 2012, before it finally tendered its $2 million policy limits and provided a sworn affidavit that its policy limits in fact provided full coverage and also covered the portion of the post-judgment interest

through the time that Travelers' $2 million limits were actually turned over to Illinois National."

¶ 68    As we discussed concerning Count III for breach of contract, no conflict of interest arose between Ryerson and Travelers based on Travelers's decision to retain control of the postjudgment and appellate defense of Ryerson, rather than tendering its policy limits to Illinois National. Thus, relief under section 155 cannot be based in any way upon Travelers having failed to inform Ryerson about a conflict of interest or the notion that Travelers was not aligned with and working for Ryerson. Moreover, Ryerson never actually faced uninsured postjudgment exposure, despite the fact that for a period of time its insurers were disputing their postjudgment obligations under the contracts.

¶ 69    Further, this does not appear to be a context in which section 155 applies. One context in which it can apply is in "any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder." 215 ILCS 5/155(1) (West 2014). As we discussed above, Ryerson cites no contractual or legal authority that Travelers was liable under the circumstances of this case to tender its $2 million primary policy limits to Illinois National at any time prior to the appeal. Absent some contractual or legal authority giving rise to a liability to tender its policy limits to Illinois National prior to the appeal, it cannot be punished for vexatious and unreasonable delay in doing so. Another context in which section 155 can apply is in "any action by or against a company *** for an unreasonable delay in settling a claim." *Id.* However, we do not believe that the tendering of policy limits by a primary insurer to an excess insurer during the course of litigation, so the excess insurer will assume control of the defense from the primary insurer, constitutes "settling a claim" within the meaning of the statute.

¶ 70    For these reasons, we affirm the trial court's dismissal of Count V of the first amended

complaint seeking a remedy under section 155.

¶ 71                          3. Count VIII under the Consumer Fraud Act

¶ 72          Ryerson argues that the trial court erred in dismissing Count VIII of its first amended

complaint, which alleges that Travelers' conduct violated the Consumer Fraud Act (815 ILCS

505/1 *et seq.* (West 2014)). The Consumer Fraud Act is a regulatory and remedial statute intended

to protect consumers and others against fraud, unfair methods of competition, and other unfair or

deceptive acts or practices in the conduct of any form of trade or commerce. *Price v. Philip Morris,*

*Inc.*, 219 Ill. 2d 182, 233-34 (2005). The elements of a claim under the Consumer Fraud Act are:

(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on

the deception; and (3) the occurrence of the deception during a course of conduct involving trade

or commerce. *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 62. A plaintiff's reliance

is not an element of a consumer fraud claim, but a valid claim must show that the consumer fraud

proximately caused the plaintiff's injury. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501 (1996).

A statutory consumer fraud claim must be pled with the same particularity and specificity as that

required under common law fraud. *Id.* The Consumer Fraud Act is to be liberally construed to

effectuate its purpose. *DOD Technologies v. Mesirow Insurance Services, Inc.*, 381 Ill. App. 3d

1042, 1051 (2008).

¶ 73          Ryerson contends that it properly plead a cause of action under the Consumer Fraud Act.

It asserts that it "pled that Travelers intentionally and repeatedly deceived Ryerson that Travelers

had properly committed and tendered its $2 million policy limits, that their interests were

completely aligned, and that Illinois National supposedly was the actual cause of the obstruction

and delay." It asserts that "Travelers intended for Ryerson to rely on these communications,

including when Travelers also sent to Ryerson letters exchanged between Travelers and Illinois

National with Travelers specifically rejecting the applicability of cited Illinois appellate authority that Travelers had a conflict of interest as to its $2 million policy limit (that it knew hadn't been tendered) against the over $27 million judgment that entitled Ryerson to insurer-paid independent counsel." Ryerson further argues that Travelers never disclosed to it that, "despite repeated requests from Illinois National, Travelers never actually had in fact offered and tendered its $2 million limits to Illinois National from February 2012 to November 2012 because Travelers was more concerned about its own financial interests in a 'very large book of business' involving other agency accounts than it was about Ryerson being promptly and fully defended and protected from the $27 million judgment and the potential freezing and seizure of Ryerson's bank accounts and assets." Ryerson argues that "Travelers also intended and knew that Ryerson actually was relying on Travelers' deception in having Ryerson divert its resources and efforts, including those of tis coverage counsel, in a needless focus and chase after Illinois National—with Ryerson stating to Illinois National that Travelers had 'committed its $2 million limits' and that Illinois National was the impediment and acting wrongfully when this was untrue."

¶ 74    A deceptive act or practice under the Consumer Fraud Act is one "including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact * * * in the conduct of any trade or commerce." 815 ILCS 505/2 (West 2014). Whether an act or practice is deceptive involves a consideration of all information available to the plaintiff at the time. *Phillips v. DePaul University*, 2014 IL App (1st) 122817, ¶ 44.

¶ 75    As we discussed above, no conflict of interest existed between Travelers and Ryerson. Thus, any alleged misrepresentation or omission by Travelers to Ryerson involving the existence of a

conflict of interest cannot be a deceptive act or practice under the Consumer Fraud Act. We further find that Ryerson's allegation that Travelers represented that it had committed and tendered its $2 million policy limits and that Illinois National was the actual cause of the obstruction and delay was not a deceptive act or practice in light of all of the information available to Ryerson. The exhibits attached to the original and first amended complaints, which control over the allegations (*Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 431-32 (2004)), make clear that Ryerson knew that Travelers was not tendering control of the postjudgment or appellate defense of the Hoffman suit to Illinois National. If Travelers had tendered its $2 million policy limits to Illinois National, the ultimate consequence or effect of this would have been that Illinois National would have assumed control of the defense. It is clear from the exhibits to the complaint that Ryerson knew that Travelers was not allowing Illinois National to assume control of the defense, regardless of what Travelers led Ryerson to believe about the primary policy limits being tendered.

¶ 76       Further, it is clear from the exhibits to the complaints that, whatever Travelers led Ryerson to believe about whether Illinois National (and not Travelers) was the cause of obstruction or delay, Illinois National was in fact taking positions to frustrate Ryerson's goal of being fully protected on both an appeal bond and the excess judgment. One such exhibit is Illinois National's letter to Ryerson of June 18, 2012, in which it purported to reserve its rights under the joint venture limitation endorsement to reduce the available policy limits to less than $25 million. Another exhibit is Illinois National's attorneys' letter to Ryerson of August 17, 2012, stating that Illinois National had "no obligation to pay the premium for an appeal bond, to procure an appeal bond, or to pay interest accruing on the judgment," as the Illinois National policy "assumes no obligation regarding appeal bonds unless [Illinois National] has 'assume[d] the defense' of the claim or suit, which it has not done." Based on the content of Illinois National's own letters to Travelers during

the relevant time period, we find that Travelers did not commit a deceptive act or practice by stating to Ryerson that Illinois National was the actual cause of obstruction and delay.

¶ 77    Finally, Ryerson argues that the trial court erred in denying its oral request for leave to replead the count of its first amended complaint under the Consumer Fraud Act. The trial court stated that it did not believe that Ryerson could plead any set of facts that could support a claim under the Consumer Fraud Act. While leave to amend pleadings is liberally granted, the right to do so is not absolute. *Richco Plastic Co. v. IMS Co.*, 288 Ill. App. 3d 782, 785 (1997). Among the factors to be considered is whether the proposed amendment would cure the defect in the pleading. *Id.* The trial court has sound discretion in determining whether leave to amend should be granted, and its ruling will not be disturbed absent an abuse of discretion. *Id.* On appeal, Ryerson fails to identify what proposed amendment it would make that would enable this court to determine whether Ryerson could cure the defects in its complaint. Further, it appears that the case continued in the trial court for over two years after Count VIII was dismissed, and during this time Ryerson never filed a formal motion for leave to amend the complaint with a proposed amended complaint attached. Under these circumstances, the failure to include a proposed amended complaint in the record on appeal results in a forfeiture of the issue. *Morris v. Ameritech Illinois*, 337 Ill. App. 3d 40, 51 (2003); see also *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 461 (1995) (plaintiff's failure to include proposed amendment in the record provides sufficient basis for affirmance of the trial court).

¶ 78                                III. CONCLUSION

¶ 79    For the reasons set forth above, the judgment of the trial court is affirmed.

¶ 80    Affirmed.