2022 IL App (1st) 220444-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
November 29, 2022

No. 1-22-0444

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 CH 1455 |
| | ) | |
| SETH PATINKIN, | ) | The Honorable |
| | ) | Alison C. Conlon, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held:* Trial court's declaratory judgment that insurer owed no duty to defend its insured is affirmed.

¶ 2    The defendant, Seth Patinkin, appeals from the trial court's order granting summary judgment in favor of the plaintiff, State Farm Fire & Casualty Company (State Farm), on its complaint for declaratory judgment. As part of that order, the trial court found that State Farm had no duty to defend Patinkin, its insured under a personal liability umbrella policy, in a commercial arbitration proceeding filed against him by two former business associates, O'Brien Investment Group, LLC (OBIG), and Robert Grosulescu. We affirm the judgment of the trial court.

¶ 3                                                                BACKGROUND

¶ 4        On September 4, 2020, OBIG filed demand for arbitration with the American Arbitration Association (AAA) that named Patinkin as respondent. In that demand, which used a standard form requesting only a "brief description" of the parties' dispute, OBIG stated that it was seeking resolution of issues raised in a related case pending with the AAA, apparently a request for mediation filed by Patinkin against OBIG and Grosulescu. It went on to state that it was especially seeking "enforcement of the parties' April 5, 2020 Separation Agreement and recovery of money paid to [Patinkin] based on his description of services not provided as well as for damages due to [Patinkin's] various breaches of the parties' Project Agreement and Separation Agreement and certain subsequent misrepresentations, etc."

¶ 5        On October 30, 2020, OBIG and Grosulescu filed a first amended demand for arbitration (demand), which is the operative underlying pleading in this case. The demand is 17 pages and provides a detailed description of the parties' dispute.[1] It is divided into three sections, the headings of which are: (1) "Statement of Facts," (2) "OBIG Seems Enforcement of the Two Agreements," and (3) "Robert Grosulescu's Situation."

¶ 6        It alleges that OBIG is an investment advisory firm in the Bitcoin futures trading business. Grosulescu was, beginning May 1, 2020, an employee of OBIG. Prior to that time, he and Patinkin had been in business together as the Patinkin Group, which they formed in late 2019. The Patinkin Group had in turn entered into a contract with OBIG (referred to as the "project agreement") to enhance its Bitcoin futures trading business. At that time, Patinkin had marketed his expertise in cryptocurrency both to Grosulescu, to persuade him to work with Patinkin, and to OBIG, to

_____

[1] The first amended demand for arbitration indicates that various exhibits were attached to it, including the contract documents giving rise to the underlying dispute. However, no such exhibits are included in the record on appeal in this case.

persuade it to hire the Patinkin Group to provide certain services, described in a document called the "Crypto Trading Project Plan for O'Brien" (Trading Plan).

¶ 7    The demand goes on to allege that Patinkin failed to do various activities called for under the Trading Plan, as summarized on an exhibit that is not included in the record on appeal. It also alleges that Patinkin "failed to do work for OBIG that he had said he would do," including missing meetings or showing up unkempt or too late or to participate.

¶ 8    On April 3, 2020, David J. Moore, who was OBIG's attorney, communicated to Patinkin that OBIG had decided not to invest any more money or resources in the project and wanted to terminate it 30 days thereafter. On April 5, 2020, Moore proposed that the parties enter into a written separation agreement. Patinkin signed the separation agreement on behalf of himself and the Patinkin Group, and he returned it to Moore that same day.

¶ 9    That separation agreement included a provision requiring all disputes be resolved through the AAA under its commercial arbitration rules. It also contained a provision requiring the Patinkin Group to return to OBIG all work product created in the course of the project. Paragraph 11 of the separation agreement provided, "The Patinkin Group understands and agrees that OBIG has a reputation for extraordinary integrity and financial competence and, as a result, also agrees to abstain from making any comments adverse to or otherwise disparaging to OBIG."

¶ 10   The demand includes six principal claims against Patinkin under the heading "OBIG Seeks Enforcement of the Two Agreements" (referring to the original project agreement and to the separation agreement). First, it alleges that paragraph 3 of the project agreement incorporated an exhibit describing Patinkin's "contribution to the success of the Project Agreement." It alleges that Patinkin breached this provision, along with another general provision, "in that he did not carry out the responsibilities he imposed upon himself" in that exhibit to paragraph 3 "or otherwise

meaningfully contribute to the business of the project agreement." As a remedy for this alleged breach, it sought (1) an award finding that the project agreement required significantly greater effort by Patinkin than he provided and that he breached his obligations under it, (2) an award mandating Patinkin's compliance with his obligations under the project agreement generally and the referenced provisions, and (3) an award of money damages for the $80,000 that OBIG paid to the Patinkin Group for services not provided as a result of the breach.

¶ 11    Second, the demand alleges that Patinkin breached various paragraphs of the project agreement and the separation agreement requiring the return to OBIG of the work product that Patinkin Group had created during the course of the project. As a remedy for this alleged breach, OBIG sought an award finding that Patinkin breached his obligations and mandating his compliance with regard to the applicable provisions of these two contracts.

¶ 12    Third, the demand alleges that, under paragraph 9 of the project agreement and paragraphs 4(c) and 8 of the separation agreement, Patinkin should not have contacted Grosulescu after April 5, 2020, and more specifically he should not have encouraged Grosulescu to abandon his job with OBIG or otherwise interfered with OBIG's business for at least the first 12 months after the termination of the project agreement. It alleges that, for "at least the rest of April," Patinkin phoned Grosulescu almost daily. It alleges that he encouraged Grosulescu to leave OBIG and work elsewhere. It goes on to allege the following:

> "His contacts with [Grosulescu] went beyond that, however, because he said to [Grosulescu] that he had seen the books of RJO, that the O'Briens had lost billions, that John O'Brien (OBIG's CEO) had squandered the family fortune, that the CME had to bail out the O'Briens or an O'Brien entity, that David [Moore] was a liar and a fraud. These statements are barred by paragraph 11 of the Separation Agreement. By this conduct of

[Patinkin's], he has breached his obligations under paragraph 8 of the Separation Agreement, paragraphs 9 of the Project Agreement and 4(c) of the Separation Agreement." As a remedy for Patinkin's alleged violations of these contractual provisions, the demand sought "the same kind of remedies" sought for the breaches described above and "that those remedies be tailored to apply to the breaches found and incorporated by reference."

¶ 13    Fourth, the demand sought to remedy Patinkin's alleged disregard of contractual provisions of the separation agreement (1) rescinding OBIG's obligations under the project agreement not to attempt to hire Patinkin Group's employees or otherwise interfere with its business for at least 12 months, and (2) undoing OBIG's compensation obligations to the Patinkin Group. It asserted that Patinkin was contending that OBIG had violated the project agreement by hiring Grosulescu, and it sought an award confirming the enforceability of the referenced paragraph and requiring that Patinkin cease and desist from any future disregard of it.

¶ 14    Fifth, the demand alleges that Patinkin agreed in the separation agreement to a waiver and release concerning any conduct of OBIG occurring prior to its execution, and he violated this provision by bringing a court case and by raising disagreements with OBIG that occurred prior to execution. As a remedy, it sought an award validating that provision of the separation agreement, finding it enforceable, and requiring Patinkin cease and desist from future violations of it.

¶ 15    Finally, paragraphs 16 and 17 of this section of the demand state as follows:

"16. Paragraphs 13(b) and (c) of the Project Agreement state that the Project Agreement shall be governed in accord with the laws of the state of Illinois and that each provision of the Project Agreement shall be interpreted in such a manner as to be valid under applicable Illinois law. Paragraph 13 comes into play because Illinois law respects contracts, releases, and agreements of the sort intended by the parties. [Patinkin's] claim

that hiring [Grosulescu] is a breach of contract or that the compensation OBIG pays [Grosulescu] as an employee is somehow subject to the October 28 emails both fail to comply with Illinois law. Accordingly, OBIG seeks a remedy requiring [Patinkin] to cease-and-desist from contending violations of either the Project Agreement or the Separation Agreement or any other contract which does not square with Illinois law.

17. In this vein, paragraph 13 certainly applies to statements [Patinkin] makes that are averse to OBIG because those statements are [in] breach of paragraph 11 of the Separation Agreement. His statements about O'Brien business, including his statements about David [Moore], violate Illinois law to the extent that they are commercial defamation."

¶ 16    The demand concludes with an additional 20 paragraphs of allegations under the heading "Robert Grosulescu's Situation," which largely involve a claim apparently made by Patinkin that he was contractually entitled to a portion of Grosulescu's compensation as an employee of OBIG. The allegations of this aspect of the demand are not relevant to the issues raised in this appeal.

¶ 17    Patinkin tendered defense of the demand to State Farm under his personal liability umbrella policy effective at the time. State Farm denied the tender and filed the instant complaint for declaratory judgment against Patinkin. In that compliant, it sought a declaratory judgment that its duty to defend Patinkin was not triggered by the facts pled in the demand and that various exclusions to coverage applied. After Patinkin filed an answer, State Farm filed a motion for summary judgment on its compliant. Patinkin filed a response to that motion.

¶ 18    On March 4, 2022, the trial court entered an order granting State Farm's motion for summary judgment and finding no duty to defend based on the facts pled in the demand. The trial court further found that three exclusions in the policy also applied to bar coverage. Patinkin filed a timely notice of appeal.

¶ 19                                                    ANALYSIS

¶ 20        On appeal, Patinkin argues that the trial court erred by finding that the allegations in the demand did not trigger State Farm's duty to defend. Pointing out that the demand expressly characterized Patinkin's statements to Grosulescu about OBIG as "defamation," he argues that State Farm's duty arises under the policy's coverage for "personal injury," which is defined as including injury arising out of the offense of "libel, slander, [or] defamation of character." By contrast, State Farm argues that the demand pled only a business dispute alleging various breaches of the project agreement and the separation agreement, not a claim for defamation.

¶ 21        A trial court's granting of summary judgment on the basis that an insurer owes no duty to defend its insured in an underlying action presents a legal question that we review *de novo*. *Pekin Insurance Co. v. McKeown Classic Homes, Inc.*, 2020 IL App (2d) 190631, ¶ 15. Summary judgment is properly granted where no genuine issue exists as to any material fact in the case and the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020).

¶ 22        The rules governing an insurer's duty to defendant its insured are familiar ones. A court determining the existence of such a duty compares the facts alleged in the underlying complaint to the relevant provisions of the insurance policy. *Joseph T. Ryerson & Son, Inc. v. Travelers Indemnity Co. of America*, 2020 IL App (1st) 182491, ¶ 33. If the underlying complaint alleges facts within or potentially within the coverage of the policy, then the insurer is obligated to defend its insured even if those allegations are groundless, false, or fraudulent. *Id.* An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaint that the allegations fail to state facts that bring the case within, or potentially within, the coverage of the policy. *Id.* Moreover, if the underlying complaint alleges multiple theories of recovery against the insured, the duty to defend arises even if only one such theory is

potentially with the policy's coverage. *Id.*

¶ 23     The underlying complaint must be liberally construed in favor of the insured. *Id.* ¶ 34. If the words used in the policy, given their plain and ordinary meaning, are unambiguous, they will be applied as written. *Id.* Courts give little weight to the legal labels by which the underlying allegations are characterized, instead determining whether the alleged conduct arguably falls within at least one of the categories of wrongdoing listed in the policy. *Id.* The duty to defend does not require that the complaint allege or use language affirmatively bringing the claims within the scope of the policy. *Id.* It is not controlled by the draftsmanship skills or whims of the plaintiff in the underlying action. *Id.* The threshold for a pleading to give rise to the duty to defend it low. *Id.*

¶ 24     Here, the pertinent provisions of Patinkin's policy provide that State Farm will provide a defense to the insured for damages because of a "loss" to which the policy applies. It defines "loss" to mean "the commission of an offense which first results in personal injury during the policy period." It defines "personal injury" to mean "injury other than bodily injury arising out of one or more of the following offenses," including "libel, slander, defamation of character."

¶ 25     Patinkin argues that State Farm's duty to defend him is triggered under these provisions because the allegations of the demand support a claim of defamation against him. Specifically, he relies on paragraphs 37 of the statement of facts and paragraphs 11 and 17 under the heading, "OBIG Seeks Enforcement of the Two Agreements," which state:

> "37. During the period between April 7, 2020 and May 5, 2020, *** [Patinkin] also made inexplicable statements to [Grosulescu] such as that he/[Patinkin] had seen the RJO books and the O'Briens had lost billions, that the CME had to bail out RJO investments, that OBIG's John O'Brien had squandered away the family fortune. [Patinkin] also told [Grosulescu] that David [Moore] was a liar and a fraud.

* * *

11. [Patinkin] phoned [Grosulescu] almost daily after April 5 for at least the rest of April. He tried to get [Grosulescu] to leave OBIG and work elsewhere, one example being [Patinkin's] attempts to have [Grosulescu] work with Lowell Kraff. His contacts with [Grosulescu] went beyond that, however, because he said to [Grosulescu] that he had seen the books of RJO, that the O'Briens had lost billions, that John O'Brien (OBIG's CEO) had squandered the family fortune, that the CME had to bail out the O'Briens or an O'Brien entity, that David [Moore] was a liar and a fraud. These statements are barred by paragraph 11 of the Separation Agreement. By this conduct of [Patinkin's], he has breached his obligations under paragraph 8 of the Separation Agreement, paragraphs 9 of the Project Agreement and 4(c) of the Separation Agreement.

* * *

17. In this vein, paragraph 13 certainly applies to statements [Patinkin] makes that are averse to OBIG because those statements are [in] breach of paragraph 11 of the Separation Agreement. His statements about O'Brien business, including his statements about David [Moore], violate Illinois law to the extent that they are commercial defamation."

¶ 26    Patinkin points out that paragraph 17 specifically characterizes his alleged statements as "commercial defamation." Thus, he argues, little construction is even necessary to read the demand in favor of coverage. He adds that, given the requirement that the underlying allegations be construed liberally and in his favor as the insured, it is undeniable that the facts in the demand fall at least potentially within the policy's coverage. He cites the fact that, in its initial demand for arbitration, OBIG stated that the dollar amount of its claim was $200,000, but its first amended demand sought to recoup only $110,000 in connection with the alleged contract breaches, leaving

$90,000 of its original demand amount unspecified. Citing OBIG's request in the demand to be " 'made whole,' " he suggests that it requires "no imagination at all" to understand that OBIG has pled a claim of defamation for which it is seeking substantial damages.

¶ 27     By contrast, State Farm argues that the demand is clear that OBIG is alleging only a business dispute involving Patinkin's breach of the two contracts that existed between them. State Farm points out that the separation agreement contained a provision under which Patinkin had agreed to abstain from making any comments that were adverse to or disparaging of OBIG. State Farm argues that the demand set forth Patinkin's statements in the context of alleging that he had breached this nondisparagement provision of the separation agreement, and it was not alleging a separate claim for defamation. State Farm further alleges that OBIG never alleged any elements of a defamation claim.

¶ 28     We agree with State Farm's argument that the demand against Patinkin does not allege a potential claim for defamation. A claim for defamation requires allegations of facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009) (citing *Krasinski v. United Parcel Service, Inc.*, 124 Ill. 2d 483, 490 (1988)). The first reason we find that the demand did not allege a potential claim for defamation is that it contains no allegations that Patinkin made statements "about" OBIG. In the arbitration, the only named claimants were OBIG and Grosulescu. Yet in the demand, Patinkin's statements are alleged to be about "the O'Briens," "RJO investments," "an O'Brien entity," John O'Brien, and David Moore. Without these other parties being named as claimants or any allegations purporting to connect the alleged statements as being about OBIG, we do not interpret the demand as potentially alleging a claim of defamation.

¶ 29        More importantly, however, there is no allegation in the demand that the statements Patinkin made to Grosulescu were false. There is no suggestion that it was the falsity of the alleged statements that gave rise to any injury sustained by OBIG. The falsity of an alleged statement has been described as the "cornerstone" of a defamation claim. See *Grant v. Trustees of Indiana University*, 870 F.3d 562, 572 (7th Cir. 2017). Without any allegations in the demand concerning the falsity of the alleged statements, we cannot interpret it as alleging facts that would potentially constitute a claim for defamation.

¶ 30        Instead, when the demand is read as a whole, OBIG's claim is clearly that Patinkin's statements were wrongful, not because they were defamatory, but because they breached contract provisions prohibiting him from making adverse or disparaging statements about OBIG or attempting to hire away its employees or to interfere with its business for 12 months following termination of the project. Paragraph 11 of the demand, after setting forth Patinkin's statements, alleges that they are "barred by paragraph 11 of the Separation Agreement." That is the nondisparagement provision, in which Patinkin agreed "to abstain from making any comments adverse to or otherwise disparaging to OBIG." Paragraph 11 of the demand then goes on to allege that Patinkin's "conduct" (*i.e.*, his phoning Grosulescu daily after April 5 in addition to making the statements) "breached his obligations under paragraph 8 of the Separation Agreement, paragraphs 9 of the Project Agreement and 4(c) of the Separation Agreement." Again, these contract provisions are not included in the record on appeal, but they are described in other parts of the demand to be an agreement not to attempt to hire away employees or otherwise interfere with the business of OBIG for at least 12 months following termination of the project.

¶ 31        As for paragraph 17 of the demand, we have difficulty deciphering exactly what OBIG is attempting to allege without being able to read the underlying contract provisions. Read in context

with the preceding paragraph 16, we interpret it to be a legal argument that the nondisparagement provision of the separation agreement should be incorporated into the project agreement also. Regardless, it is clearly an allegation grounded in contract, and it is unambiguously not alleging a standalone tort claim for defamation. It refers to paragraph 13 of the project agreement, which is described in paragraph 16 as a provision stating that the project agreement shall be governed in accord with the laws of the state of Illinois and that each of its provisions shall be interpreted in such a manner as to be valid under applicable Illinois law. Paragraph 16 asserts that paragraph 13 of the project agreement "comes into play because Illinois law respects contracts, releases, and agreements of the sort intended by the parties." It then references two legal positions being taken by Patinkin (that OBIG's hiring of Grosulescu was a breach of contract and that Patinkin was contractually entitled to a portion of Grosulescu's compensation from OBIG) and states that these positions "fail to comply with Illinois law." Finally, it seeks a remedy requiring Patinkin "to cease-and-desist from contending violations" of either of the two contracts between the parties or "any other contract which does not square with Illinois law."

¶ 32        Paragraph 17 of the demand then attempts to extend this rationale to the nondisparagement provision of the separation agreement by stating, "In this vein, paragraph 13 certainly applies to statements [Patinkin] makes that are averse to OBIG because those statements are in breach of paragraph 11 of the Separation Agreement." As with the legal positions mentioned in paragraph 16 that allegedly fail to comply with Illinois law and therefore come within the ambit of paragraph 13 of the project agreement, paragraph 17 concludes by alleging that Patinkin's "statements about O'Brien business, including the statements about David, violate Illinois law to the extent that they are commercial defamation." It does not mention any remedy.

¶ 33        Regardless of the validity of such an argument, paragraph 17 is clearly making a contract-

based argument that paragraph 11 of the separation agreement should be incorporated into the project agreement through its paragraph 13. The assertion that Patinkin's statements violate Illinois to the extent that they are "commercial defamation" is pled as a reason why paragraph 13 should be interpreted as incorporating paragraph 11. We find no ambiguity about the fact that paragraph 17 is not attempting to state a potential tort claim for defamation in addition to the contract claims expressly pled.

¶ 34      The mere fact that paragraph 17 uses the word "defamation" is insufficient to impose a duty to defend, where the facts actually pled in the demand do not support a potential tort claim for defamation by OBIG. In determining whether a duty to defend exists, courts give little weight to legal labels used in the complaint, instead focusing on the facts pled. *Joseph T. Reyerson & Son*, 2020 IL App (1st) 182491, ¶ 34. In the demand, the word "defamation" is merely a legal label used in a conclusory fashion in the context of a contract-based legal argument.

¶ 35      In determining duty to defend, it is the actual demand, not some hypothetical version of it, that we must consider. *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 761 (2005). As discussed above, the actual demand in this case simply does not plead facts giving rise to a tort claim for defamation. It would be complete speculation for us to conclude that the demand supported a potential tort claim for defamation by OBIG based on statements alleged only to violate contract provisions prohibiting the making of adverse or disparaging statements, the hiring away of employees, or interference with business. The trial court correctly found that State Farm owed no duty to defend under the facts pled in the demand.

¶ 36                               CONCLUSION

¶ 37      For the reasons set forth above, we affirm the judgment of the trial court

¶ 38      Affirmed.